EXHIBIT A

1    Michael A. Caddell (SBN 249469)
     mac@caddellchapman.com
2    Cynthia B. Chapman (SBN 164471)
     cbc@caddellchapman.com
3    Amy E. Tabor (SBN 297660)
     aet@caddellchapman.com
4    CADDELL & CHAPMAN
     P.O. Box 1311
5    Monterey, CA 93942
     628 East 9th Street
6    Houston TX 77007-1722
     Tel.: (713) 751-0400
7    Fax: (713) 751-0906

8    *Attorneys for Plaintiff*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**01/23/2023** at 12:06:10 PM

Clerk of the Superior Court
By Brandon Krause, Deputy Clerk

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                      **COUNTY OF SAN DIEGO**

| | |
|---|---|
| 11   ALI NILFORUSHAN,<br><br>12            *Plaintiff,*<br><br>13            *v.*<br><br>14   U.S. CENTER FOR SAFESPORT<br><br>15            *Defendant.*<br>16 | CASE NO. 37-2023-00002845-CU-NP-CTL<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filed: January 23, 2023 |

17       Plaintiff Ali Nilforushan ("Plaintiff" or "Nilforushan"), brings suit against Defendant

18   U.S. Center for SafeSport ("SafeSport"), and upon personal knowledge as to Plaintiff's own

19   conduct and on information and belief as to all other matters based upon investigation by

20   counsel, alleges as follows:

21                      **I. SUMMARY OF ALLEGATIONS**

22       1.    This case arises from SafeSport's contrived and demonstrably false allegations

23   and malicious persecution of Plaintiff in retaliation for his participation as a witness in a

24   separate SafeSport investigation in which he truthfully refuted the claims of the claimant in that

25   particular investigation. Plaintiff's recollection of the events at issue in that investigation not

26   only refuted the claimant's version of events, but apparently conflicted with SafeSport's result-

27   oriented agenda to corroborate the claimant's allegations against the respondent in that matter.

28

2.     SafeSport describes itself as an independent nonprofit "[d]edicated solely to ending sexual, physical, and emotional abuse on behalf of athletes everywhere." According to SafeSport, "[a]s reports of sexual abuse in amateur sport made headlines in the 2010s, it had become clear: America deserved a safer sport culture. . . . From this need, the U.S. Center for SafeSport was created."  Given a recognized need to protect minor athletes, "[t]he Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 codified the U.S. Center for SafeSport, . . . as the nation's safe sport organization."

3.     In late 2020, a federal law was passed—the Empowering Olympic, Paralympic, and Amateur Athletes Act of 2020—which was intended to strengthen safeguards for athletes by, among other things, providing a reliable annual funding stream from the U.S. Olympic & Paralympic Committee ("USOPC") "to bolster [according to SafeSport] our long-term sustainability." With that support, SafeSport reiterated its mission, proclaiming, "[w]e will not rest until we can ensure that every athlete everywhere is safe, supported, and strengthened."

4.     Plaintiff is a professional equestrian and former Olympian show jumper who now makes his living training high-level equestrians, many of whom compete internationally and at the World Cup level and aspire to compete on Nations Cup and Olympic teams. Plaintiff is also a highly successful equestrian show operator in California who has elevated West Coast equestrian shows to a level that has created concern for certain show operators who are unable (or unwilling) to successfully compete against Plaintiff because he consistently invests more resources into the shows he produces, which in turn has attracted equestrian show jumpers from all over the world.

5.     The initial investigation against Plaintiff arose two years ago, in February 2021, when an intoxicated claimant ("Claimant A") angrily confronted Plaintiff due to her unfounded and incorrect belief that Plaintiff somehow disagreed with SafeSport's investigation of another Olympic equestrian, Rich Fellers.  Regarding Claimant A's confrontation of Plaintiff, SafeSport was aware that, in addition to Plaintiff, there were three eyewitnesses to the event, all of whom refuted Claimant A's portrayal of the confrontation.  Yet, SafeSport opted to interview only one

of the witnesses—a close friend of Claimant A—who both submitted to an interview and subsequently provided a written description of the events that squarely refuted the underlying complaint.  Regarding the two other eyewitnesses, neither of whom SafeSport ever contacted, each unilaterally submitted to SafeSport written statements also refuting the underlying complaint. Ignoring all three eyewitness reports, in a published announcement, SafeSport temporarily suspended Plaintiff from equestrian sports during the middle of an international horse show (at which Plaintiff was training multiple high-level equestrians) and publicly humiliated him based on claims that SafeSport knew were groundless and bereft of any credible evidentiary support.

6.    With no evidentiary support for the temporary ban placed on Plaintiff and Plaintiff's insistence that he be given an emergency hearing under SafeSport's own rules, SafeSport lifted the ban several days later. However, unwilling to clear Plaintiff's name, SafeSport left the investigation open and issued a "no contact" order against Plaintiff instructing him not to contact the widely-discredited claimant.

7.    Unable to secure witness corroboration regarding Claimant A's allegations against Plaintiff, in March 2021, SafeSport gave Plaintiff notice of new allegations, this time relating to Plaintiff's relationship with a former girlfriend that dated *14 years back* to 2007. In response, Plaintiff provided SafeSport with unimpeachable, independent evidence which proved the allegation to be false.

8.    In March 2021, during the pendency of the investigations of the allegations described above, whistleblower employees within SafeSport wrote to Plaintiff warning him, among other things, "You were targeted by SafeSport because you gave favorable evidence in support of another Respondent in another equestrian case.  As you now know, SafeSport is fundamentally unfair.  There is no actual due process of law.  Your name was destroyed without any notice or hearing."

9.    Consistent with the SafeSport Whistleblowers' claims, over the last two years, SafeSport has worked with business competitors of Plaintiff—intent on running Plaintiff out of

COMPLAINT AND DEMAND FOR JURY TRIAL

business—and other untrustworthy witnesses to manufacture wrongful allegations unfairly targeting Plaintiff.  Plaintiff has refuted all allegations with credible evidence, except for the most recent allegations (issued in November 2022) which SafeSport refuses to disclose to Plaintiff other than by initials of the supposed claimants and which, therefore, he cannot refute. At all relevant times, SafeSport has acted with malice in the persecution of Plaintiff with groundless allegations of misconduct.

10.     Also consistent with the SafeSport Whistleblowers' claims that SafeSport has unfairly targeted Plaintiff, in November 2022, one of the witnesses against Plaintiff ("Witness 1"), reported that she had been relentlessly pressured and coerced by Kurt Fabrizio, a SafeSport investigator, and another witness (a business competitor of Plaintiff) to give false testimony against Plaintiff. Witness 1 reported that while she succumbed to such pressure by giving SafeSport inaccurate information against Plaintiff, she ultimately decided that she could no longer participate in ruining Plaintiff's career and personal life by providing false information to SafeSport's investigator.

11.     On January 12, 2023, at an equestrian event, another witness ("Witness 2")— who has supported false allegations against Plaintiff—approached Plaintiff in an attempt to engage in conversation. Plaintiff explained that due to the pending SafeSport investigations against him, he would not speak with her. In response, and in an apparent attempt to make amends, Witness 2 volunteered to Plaintiff, "I don't want have anything to do with this anymore. I will call Kurt [Fabrizio] tomorrow and tell him to back off."

12.     Over almost two years, Plaintiff and independent witnesses have refuted the unfounded allegations against Plaintiff.  Despite the overwhelming evidence of no misconduct and the passage of almost two years, Defendant has failed and/or refused to dismiss the charges or close the investigations against Plaintiff.

13.     Defendant, abusing its position of authority over Plaintiff, has willfully engaged in egregious and outrageous conduct constituting an intentional infliction of emotional distress. At all times relevant to this suit and in regard to all of the subject claims and causes of action,

Defendant's acts and omissions occurred intentionally and with actual malice to harm Plaintiff. 36 U.S.C. § 220541(d)(2).

14.   As an actual and proximate result of Defendant's extreme, egregious, and outrageous conduct, over the last two years, Plaintiff has suffered continuous severe emotional distress, including anguish, depression, anxiety, worry, sleeplessness, shock, public humiliation, anger, shame, pervasive stress, racing heart, appetite changes, and fear of losing his livelihood. As detailed below, SafeSport acted intentionally and with malice to cause Plaintiff's extreme emotional distress.  For these injuries resulting from SafeSport's intentional and malicious conduct, Plaintiff seeks to recover compensatory and punitive damages.

15.   Plaintiff seeks an order enjoining Defendant from further persecution of him for the contrived allegations that remain pending against him and awarding him compensatory and punitive damages as well as attorney's fees to the extent recoverable under California and/or federal law, costs, and prejudgment and post-judgment interest, as well as any other preliminary or equitable relief the Court deems appropriate.

## II. PARTIES

### A.   Plaintiff

16.   Plaintiff Ali Nilforushan is a resident of San Diego County, California.

### B.   Defendant

17.   Defendant U.S. Center for SafeSport ("SafeSport") is a nonprofit corporation with its principal place of business in Denver, Colorado.

18.   SafeSport has authority under federal law to investigate and resolve allegations of physical, emotional, or sexual abuse and other misconduct concerning individuals who participate in the Olympic & Paralympic Movement, including those events, programs, activities, and/or competitions under the oversight of the U.S. Olympic & Paralympic Committee, the national governing bodies, and/or their local affiliated organizations.

19.   SafeSport was established under 36 U.S.C. § 220541.  By statute, any action by SafeSport against an individual within its jurisdiction is required to be "carried out in a manner

that provides procedural due process to the individual." 36 U.S.C. § 220541(a)(1)(H). SafeSport's policies and procedures are guided by the SafeSport Code for the U.S. Olympic and Paralympic Movement ("SafeSport Code").

### III. JURISDICTION AND VENUE

20.     This Court has jurisdiction over Defendant SafeSport as it regularly conducts business throughout California, including in San Diego County.   SafeSport regularly investigates and prosecutes claims and complaints in San Diego County, California and has a substantial connection with the forum State.   SafeSport's frequent and persistent activities in the State of California are such that the exercise of jurisdiction over SafeSport does not offend traditional notions of fair play and substantial justice.

21.     Venue is appropriate in this county because the injuries giving rise to the alleged causes of action occurred in San Diego County and because Plaintiff resided in San Diego County at all times relevant to this suit. *See* CAL. C.C.P. § 395(a). Venue is also appropriate in this county because San Diego County is the county in which the causes, or some part of the causes, of action arose for the recovery of a penalty imposed by statute. *See* CAL. C.C.P. § 393(a); 36 U.S.C. § 220541. Venue is also appropriate in this county because San Diego County is the county in which the causes, or some part of the causes, of action arose from the acts of a public officer or person in virtue of the office. *See* CAL. C.C.P. § 393(b).

### IV. FACTUAL BACKGROUND

**A.    February 2021: First Allegation of Misconduct, Refuted by All Percipient Witnesses to the Incident, Still Pending After 23 Months**

22.     Plaintiff is a renowned equestrian show jumper.  Plaintiff rode for the Olympic team for the Islamic Republic of Iran.  With an accomplished career as a trainer in equestrian sports, Plaintiff trains World Cup athletes, many of whom aspire to ride on Nations Cup and Olympic Teams.  Under the name Nilforushan Equisport Events, Plaintiff is currently licensed with the United States Equestrian Federation ("USEF") to run 18 weeks of horse shows in

California.  Plaintiff is a member of the USEF, and as such, he is subject to the disciplinary jurisdiction of the SafeSport Code.

**1. In another SafeSport investigation, Plaintiff provided a witness account supportive of the accused, but contrary to SafeSport's agenda to find for the claimant in that matter.**

23.     In 2020, SafeSport investigated a claim against an equestrian involving an alleged incident that occurred 25 years ago ("2020 SafeSport Investigation").  Plaintiff provided a witness account to SafeSport in support of the accused.  On information and belief, Defendant was frustrated and disturbed that Plaintiff's account refuted the claimant's allegations against the accused. In part, because of Plaintiff's statements in support of the accused, the principal investigator for SafeSport recommended against pursuing claims against the accused.

24.     Regarding the investigation of the claim against the accused referenced in paragraph 23, another witness contacted by SafeSport reported that the SafeSport investigator attempted to pressure her into giving a statement that supported the claimant's allegations, but was not truthful. She reported that the investigator was "trying to put words into my mouth." This witness refused to provide untruthful testimony, instead only providing a truthful account of what she recalled, which also happened to support the accused.

**2. Following Plaintiff's involvement as a witness in the 2020 SafeSport investigation, SafeSport commenced its campaign to target Plaintiff with false allegations provided by a widely discredited claimant.**

25.     On or about February 13, 2021, at an international horse show in Thermal, California, Claimant A, an intoxicated amateur adult equestrian angrily confronted Plaintiff with bizarre threats and accusations. Plaintiff advised her that she was "not going to last in this business if [she didn't] get it together." Plaintiff was referring to her obvious intoxication and lack of commitment to the equestrian sport.  Several witnesses observed the situation and provided written accounts to SafeSport about Claimant A's accusations:

(A)  Witness 3, who was a close friend of Claimant A and also knew Plaintiff, has detailed knowledge of the preceding events.  Specifically, on February 10, 2021, Plaintiff "had a kind and brotherly conversation with me [Witness 3] regarding the company I keep. He knows

that I am a kind and professional young girl. He only shared this conversation with me out of concern for me reaching my full potential. [Claimant A] has always carried out a 'party girl' lifestyle and has confronted/angered multiple people in the industry while in a drunken state. During these past two weeks of Thermal [the international horse show] her drinking level had increased drastically. When [Plaintiff] and I spoke, the name Rich Fellers [who was then under investigation by SafeSport], or anything regarding that situation, was never brought up. When I brought up this conversation with [Claimant A] on the 12th it was only in the effort to help her realize her [drinking] level was an issue and that something needed to change. Rather than self-reflection [Claimant A] chose to assume that [Plaintiff] and others felt this way about her due to the [ongoing investigation of Rich Fellers]."

Witness 3 also provided SafeSport a detailed description of Claimant A's confrontation of Plaintiff on February 13, 2021: "[Claimant A] had consumed three 13 oz glasses of wine in VIP during the Grand Prix. She was extremely intoxicated and was set on confronting Ali [Plaintiff] over something she assumed had to do with her involvement in the [ongoing investigation of Rich Fellers], which was completely false.  I repeatedly advised her to not confront him, especially in the drunken state she was in, but she chose to ignore me.  She left my barn to go confront [Plaintiff] at his barn. I did not accompany her for I still had things to do at my barn. After 30 minutes passed I became concerned that she could have created an unnecessarily escalated interaction. Out of concern I went over to [Plaintiff's] barn to make sure things were okay. When I arrived [Plaintiff] was sitting in his car with his wife and speaking with [Witness 5]. I then asked [Plaintiff] if [Claimant A] had stopped by, and he informed me that she had not. I then explained that [Claimant A] felt [Plaintiff] did not like her because of her involvement in the [investigation of Rich Fellers].  [Plaintiff] then reassured that his thought towards [Claimant A] were formed well before the [Fellers investigation], and stressed his disgust/discontent towards [Rich Fellers'] involvement with [the minor claimant in the Fellers investigation]. As [Plaintiff] and I were speaking [Claimant A] stormed up with a purposeful walk. Without hesitation she went right up [to] the open passenger window, where

[Plaintiff] was sitting, waving her finger into the car/[Plaintiff's] face. Yelling while slurring her words, she began to tell him off saying, 'How dare you think that I have a black cloud around me. Who are you to even think anything of me. You don't even know the truth of the [Fellers investigation]. How dare you think of me being the bad guy in the case. Oh, and my attorney will be in contact with you in the next 24 hours.' Her entire approach as she spoke was aggressive and in an attacking manner. In my observation, [Plaintiff] then responded how I feel any normal person would respond to a confrontation like that. I observed that he was stunned, offended, and felt disrespected by her approach/words. He then responded saying, 'What are you talking about? I have never said anything about your involvement in the [investigation of Rich Fellers]. I didn't even know that you were personally involved. You have come at my wife in a disrespectful way on a night out (this was at a horse show party last year at Thermal), and start drinking in VIP at 11:00 am at the latest. Things are going to catch up to you; it's only a matter of time. Just you see, you're not going to last in this industry for long.' He also then spoke to her about her lack of respect in how she speaks. It was then at this time that [Claimant A] stormed off leaving the conversation."

Addressing Claimant A's alcohol consumption in detail, Witness 3 concluded with several supporting remarks: "As someone who is [Claimant A's] friend, and has a much closer relationship with [her] than with [Plaintiff], I deeply feel that her allegations of threats are wildly exaggerated and wrongfully placed on [Plaintiff]. I personally took [his] words, 'Things are going to catch up to you; it's only a matter of time. Just you see, you're not going to last in this industry for long' as him referring to the behavior she has shown over the past several year [sic]. As a major support for [Claimant A] over the past 7 months I did not take [Plaintiff's] words as a threat of future actions he would undergo, but as a wake up call to her. Just like myself, I took [Plaintiff's] words as him trying to show her that her behavior over the years has to change, or it will naturally catch up to her in a negative way." "I don't feel that [Claimant A's] complaints have any credibility." "I cannot turn a blind eye towards the injustice she is

trying to bring onto [Plaintiff]." "The work you guys [SafeSport] do is far too important to be wasted on false claims like this."

(B)  Witness 4, who voluntarily submitted a witness statement to SafeSport, observed the circumstances surrounding the February 13, 2021 incident.  A week earlier, Claimant A "was severely intoxicated at the DIHP horse show and was disparaging [Witness 3], who is supposedly [Claimant A's] close friend. [Plaintiff], being the caring person he is, encouraged [Witness 3] to surround herself with positive, likeminded people, who are, in fact, real and trustworthy friends." Apparently, Claimant A learned of Plaintiff's conversation with Witness 3, "which likely explains why [Claimant A] angrily approached [Plaintiff] and threatened him with legal action on February 13." That day, Claimant A approached Witness 4 and Plaintiff, while Claimant A "was clearly intoxicated, stumbling, and had a glass of wine in her hand." Pointing her finger with threatening tone, Claimant A "immediately angrily confronted [Plaintiff] and said her attorneys would be contacting him to 'clear the air.'" "She then began saying things that made absolutely no sense to us." Unknown to Witness 4 and Plaintiff at the time, Claimant A was involved in the SafeSport investigation of Rich Fellers. Claimant A made repeated reference to Rich Fellers, to which Plaintiff responded, "I have no idea what you're talking about."

(C)  Witness 5, who voluntarily submitted a witness statement to SafeSport, observed the February 13, 2021 conversation.  According to Witness 5, Claimant A approached Plaintiff "armed with a glass of wine and threatening him with legal action to 'clear the air.'" Claimant A, "who was quite intoxicated at the time and wasn't making a lot of sense, took us all by surprise. She was slurring her words and going on about how 'the next conversation would be with her lawyer' and that [Plaintiff] should 'be careful.'" Plaintiff "tried to get through to [Claimant A] by telling her that she needs to change her behavior, in particular, she should stop her routine excessive drinking…." "He specifically told her that she wouldn't last long in the equestrian world if she doesn't start to have respect for the people who know more than her and can teach her.  His only point in the conversation was that she needed to get her life together

and start taking the sport seriously if she hopes to achieve any success." Regarding the Fellers investigation in which Claimant A was somehow involved, Witness 4 also observed that "[i]ndeed, at the time of the conversation, none of us were even aware of [Claimant A's] alleged role" in the SafeSport investigation of Rich Fellers.

(D) Witness 6, who voluntarily submitted a statement to SafeSport, observed Plaintiff's preceding conversation with Witness 3 on approximately February 10, 2021, which Witness 6 described as "an encouraging conversation between a mentor and mentee." Witness 6 also noted, "I also have had nothing but positive, supportive, encouraging, and extremely professional experiences working with the Nilforushans."

(E) Witness 7, who voluntarily submitted a statement to SafeSport, indicated that Claimant A had approached her about her allegations against Plaintiff as well as complaints or potential complaints against other equestrians. Based on these conversations with Claimant A, Witness 7 noted that "I have yet to find [Claimant A] far from disputes of her own creation and frequently heavily intoxicated."

(F) Witness 8, who voluntarily submitted a statement to SafeSport, reflected on her dealings with Claimant A and stated that Claimant A had "lied repeatedly to me," "is of awful character," and "can not [sic] be trusted."

26. Ultimately, Claimant A filed a complaint against Plaintiff with SafeSport alleging that Plaintiff verbally harassed and intimidated her supposedly because she was a witness in the Fellers investigation.

27. Following Claimant A's submission of her complaint to SafeSport, SafeSport spoke to Witness 3 by telephone on February 17, 2021. Then, on February 18, 2021, as quoted above in paragraph 25(A), Witness 3 sent the SafeSport investigator an email further addressing the underlying allegations. While SafeSport knew that there were other percipient witnesses to Claimant A's confrontation of Plaintiff, SafeSport opted not to contact any of the other witnesses to corroborate Witness 3's account or check the credibility of Claimant A's account of the conversation.

28.     On February 19, 2021, one day <u>after</u> receiving Witness 3's written account of the underlying incident, and six days after the incident in question, SafeSport provided Notice of Allegations and Imposition of Temporary Measures against Plaintiff relating to Claimant A's complaint.  The unfounded allegations—refuted by every witness to the confrontation initiated by Claimant A—are as follows:

> It was reported to the U.S. Center for SafeSport's Response & Resolution Office that on February 13, 2021, you engaged in Abuse of Process by verbally harassing and intimidating [Claimant A] from participating in the Center's process concerning [Claimant A's] involvement in an unrelated sexual misconduct investigation in which you are not a party. It is further alleged you engaged in retaliation by threatening [Claimant A] with comments such as "watch out," and "you don't know what's coming," and "you're not going to be in the sport for long."

29.     The detailed witness accounts quoted above demonstrate that Claimant A's allegations are wholly unfounded and demonstrably false. Setting aside the overwhelming evidence that Plaintiff's conduct was appropriate, the allegations themselves do not even support the charge of verbal harassment.  Under the SafeSport Code, only "repeated or severe" misconduct can rise to the level of "harassment." SafeSport Code § IX.D.5. To constitute "harassment," the underlying repeated or severe conduct must (a) cause fear, humiliation, or annoyance, (b) offend or degrade, (c) create a hostile environment,[1] (d) reflect discriminatory bias, or (e) violate federal or state law.  The unfounded allegations simply do not support the charge of harassment under the SafeSport Code. It is also noteworthy that "[c]onduct may not rise to the level of [h]arassment if it is merely rude (inadvertently saying or doing something hurtful), mean (purposefully saying or doing something hurtful, but not as part of a pattern of behavior), or arising from conflict or struggle between persons who perceive they have incompatible views or positions." *Id.*

---

[1] A "hostile environment" requires misconduct that is "sufficiently severe, persistent, or pervasive such that it interferes with, limits, or deprives any individual of the opportunity to participate in any program or activity. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective."  SafeSport Code § IX.C.1.b.  "[T]he perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment." *Id.*

30.     With no prior notice to Plaintiff and no opportunity to explain the events of February 13, 2021, SafeSport imposed a temporary suspension of Plaintiff, effective February 19, 2021. Even assuming that the inaccurate allegations against Plaintiff were true, which they obviously were not, there was no cause for the temporary suspension. The underlying events did not involve minors, did not suggest sexual misconduct, and did not create any threat of imminent danger to any party or other equestrian. The temporary suspension was a dramatic overreaction to false accusations by an inebriated equestrian. The suspension was clearly improper in light of the evidence that SafeSport had already received refuting Claimant A's complaint, but even more improper in light of SafeSport's willful disregard of even minimum standards of investigation before taking such a punitive action.

31.     At the time that he received notice of the suspension, Plaintiff was coaching multiple, high-level equestrians at the international horse show in Thermal, California. Because of the suspension, Plaintiff was required to immediately abandon the show grounds, which damaged his working relationship with his riders and his personal and business reputations, and caused him to lose income and suffer severe emotional distress.

32.     SafeSport publicly posted notice that Plaintiff was suspended from participating in any event, program, activity, or competition. Because SafeSport is primarily associated with investigation of allegations of sexual abuse of minor athletes, the incorrect—but predictable and logical—assumption in the equestrian community was that Plaintiff was involved in the sexual abuse of a minor. The public notice and resulting inferences severely damaged Plaintiff's professional and personal reputation, causing him severe emotional distress in the form of anguish, nervousness, grief, sleeplessness, anxiety, worry, shock, and humiliation.

33.     On February 19, 2021, Plaintiff immediately requested a temporary measures hearing. Plaintiff noted in his request that "[t]his false information is damaging to my reputation as well as my livelihood, and I would like to put an end to this immediately." In accordance with the SafeSport Code, Plaintiff was entitled to a temporary measures hearing within three days (72 hours) of the processing of the request. SafeSport Code § XIV.40(a). Almost two

years later, no such hearing has been afforded to Plaintiff. Instead, SafeSport lifted the temporary suspension but, notwithstanding witness accounts unanimously discrediting Claimant A's allegations against Plaintiff, refused to close the matter and directed Plaintiff not to contact Claimant A or her family.

34.     The witness accounts of Witness 4, Witness 5, Witness 6, Witness 7, and Witness 8 were provided to SafeSport within days of the February 19, 2021 notice. As previously noted, during the six days that passed between the incident in question and the imposition of SafeSport's temporary suspension of Plaintiff from his profession, SafeSport spoke only with one witness, Witness 3, about her observation of Claimant A's confrontation of Plaintiff. In regard to the accounts offered by Witness 4, Witness 5, Witness 6, Witness 7, and Witness 8, to Plaintiff's knowledge, SafeSport has still never reached out to or spoken with those witnesses over the last two years.

35.     On February 25, 2021, SafeSport provided a Notice of Additional Allegation: "Further investigation resulted in additional allegations of emotional misconduct concerning the same incident on February 13, 2021...." Notwithstanding its receipt of six witness statements addressing the unfounded allegations, SafeSport refused to administratively close the February 2021 allegations. They remain pending nearly two years later.

**B.     Early March 2021: SafeSport Whistleblower Employees Warn Plaintiff That He Is Being Targeted.**

36.     On March 7, 2021, Plaintiff received an unsolicited email from whistleblowers within SafeSport with the subject line of "Mr. N: SafeSport targeted you." The email includes reference to facts that could not have been known to anyone outside of SafeSport, such as the identity of Plaintiff's SafeSport attorney (Howard Jacobs) and that SafeSport had previously interviewed him regarding the investigation of allegations against another equestrian. In this interview, to SafeSport's acute disappointment, Plaintiff squarely and truthfully refuted the claimant's allegations. The first email from the whistleblowers states as follows:

> We work inside of SafeSport in Denver. We must remain anonymous. We fear for our jobs. You were targeted by SafeSport because you gave favorable evidence in support of another Respondent in another equestrian case. As you now know,

SafeSport is fundamentally unfair. There is no actual due process of law. Your name was destroyed without any notice or hearing. You're not alone. Ask Bob McDonald. We understand from our media contacts that a group of female gymnasts in Texas have hired a lawyer to pursue their own complaints against SafeSport, but they need your help. Please ask around and find out about that group. Their eventual lawsuit might help put an end to SafeSport tyranny before anyone else gets hurt. SafeSport fires anyone who raises concerns about the unfairness of the process. Ask around, you'll learn a lot. SafeSport is full of SJW [Social Justice Warriors] who hate equestrian because the people in equestrian are 'rich white men.' (A quote we have heard many, many times.) Ask the right people and you'll see the official, internal e-mails where CEO Colon encouraged staff to participate in BLM protests and to disseminate anti-white, anti-capitalist literature and videos. SafeSport is led by unqualified people who have neither the experience or discretion to guide the agency. If you knew the actual education and experience of the SafeSport leadership, you'd be shocked. The organization is overwhelmingly led by angry liberal women with a social agenda. We believe Howard Jacobs is a fine person and a fine attorney but he is not the attorney you and others need to take on SafeSport in court.  SafeSport attorney Zonies brags about how close he and Jacobs are. Please don't share this with anyone, not even attorney Jacobs. We don't know what he might tell attorney Zonies and that might start another witch hunt. Like we said, we fear for our jobs. We know that leadership monitors e-mails and phone calls for leaks. Our paranoia is justified.

37.     Subsequent emails from the whistleblowers between May 7 and May 17, 2021, revealed additional facts, further establishing Defendant's malice and the SafeSport whistleblowers' credibility:

(A) "You need to know that one woman in SafeSport, Heather O'Brien, was behind the assault on you. She manipulates the other weaklings inside our company to do her bidding."

(B) "Regardless of who you hire, and you need to hire someone, and when that lawyer starts digging, the truth will come out quickly."

(C) "Many of us here at SafeSport are lawyers.  We know bad things and we see them. Many of us said that the way you were treated was what we call a tort.  We really hope you muster the courage and the resources, hire the right lawyer, and go after this place."

(D) "You simply do not understand who you are dealing with.  Most of our leaders do not care if you are innocent.  They only care that you are a wealthy male and that you must be diminished.  Heather O'Brien is a man-hating, power-hungry zealot.  She makes all decisions.

She has eliminated any who oppose her.  She'd fire us if she knew we were in contact with you.  We've told you all that we know.  Your choice is clear.  Fight or succumb."

(E) "[W]e are all investigators who work full time for SafeSport from our homes.  That was true even before COVID.  (All of us personally live out [of] state.  We're only in Denver at the home office at most two or three times a year.  I personally live on the West Coast.  My colleagues are scattered all over the U.S.)  Finally, Ms. O'Brien works from her home in Colorado Springs as frequently as she is in the Denver office."

(F)  "[A]sk yourself one more thing, 'How many other people must be hurt before someone stands up and fights back?'"

C.    **Late March 2021: Second Allegation of Misconduct, Refuted by Expert Polygraph Evidence, Still Pending After 22 Months**

38.    Having failed to establish the credibility of Claimant A's allegations against Plaintiff, SafeSport transitioned to developing a new, but equally spurious, claim against Plaintiff. On March 30, 2021, SafeSport provided notice of an allegation based on a public and well-known relationship Plaintiff had with his former girlfriend ("Claimant B") 14 years prior, in 2007, when both parties were adults.  On information and belief, the SafeSport Whistleblowers who first contacted Plaintiff on March 7, 2021, knew at that time that SafeSport was developing the additional, false allegation against Plaintiff based on his prior relationship with Claimant B.

39.    Determined to disprove Claimant B's allegation, Plaintiff took the extraordinary step of submitting to a polygraph examination, which conclusively demonstrated the new allegation to be false. The polygraph examination was conducted by a highly esteemed examiner with a PhD in Psychophysiology who has been recognized by multiple courts as an expert in polygraph testing and has submitted expert testimony throughout the United States and Europe.

40.    Plaintiff cooperated with SafeSport investigators related to the new allegation based on his prior relationship with Claimant B and provided the polygraph examination results

to SafeSport. However, as with the February 2021 investigation of Claimant A's refuted allegation, once again, SafeSport refused to administratively close the March 2021 investigation. It therefore also remains pending nearly two years later.

**D.     February 2022: Third and Fourth Allegations of Misconduct, Both Refuted and Unsupported by All Witnesses, Still Pending 11 Months Later**

41.     Facing incontrovertible evidence refuting the allegations of Claimant A and Claimant B, on February 17, 2022, SafeSport provided Plaintiff with—yet again—a Notice of Additional Allegations, this time asserting that, in November 2021, Plaintiff supposedly committed an "abuse of process" by allegedly disclosing the name of Claimant B as a SafeSport claimant to another person, Witness 1 (referenced above in paragraph 10). SafeSport also alleged that, in February 2021, Plaintiff allegedly committed an abuse of process by purportedly influencing the participation of Witness 3, one of the many percipient witnesses who provided SafeSport with a statement refuting Claimant A's account of her drunken confrontation of Plaintiff in February 2021.

42.     As he had with the February and March 2021 allegations, Plaintiff refuted the February 2022 allegations by written response through his counsel, dated April 1, 2022. As Plaintiff explained, Witness 1 actually told him that she knew that Claimant B was a claimant against him. Witness 1—who was in regular contact with SafeSport—also claimed that she was aware of every equestrian SafeSport case that was ongoing, and she named other subjects of ongoing investigations.

43.     Plaintiff further explained that he did not attempt to influence Witness 3's account of the events on February 13, 2021. As with other witnesses, Plaintiff asked that Witness 3 put in writing what she observed about the February 13, 2021 interaction with Claimant A. Plaintiff did not suggest to Claimant A what she should say, and he never tried to influence what Witness 3 would report, or has reported, to SafeSport. Never has Witness 3 indicated to Plaintiff—or more importantly to SafeSport—that the written observations she submitted to SafeSport resulted from Plaintiff pressuring or influencing her. Moreover, her

observations have been corroborated by multiple other percipient witnesses to the February 13, 2021 confrontation.

44.   Defendant never responded to the April 1, 2022 letter from Plaintiff's attorney representing him in the SafeSport investigations. Again, despite Plaintiff's cooperation with the SafeSport investigation, overwhelming evidence submitted by multiple, credible witnesses, and Plaintiff's correction of others' accounts, Defendant refused to administratively close the February 2022 allegations. Almost a year has passed since the February 2022 allegations first arose, and the inaccurate claims remain pending.

E.   **November 2022: Fifth Allegation of Misconduct, the Details of Which SafeSport Refuses to Share with Plaintiff, Still Pending After Three Months**

45.   Undoubtedly frustrated in its inability to prove any of its pending allegations against Plaintiff, on November 9, 2022, SafeSport manufactured yet another Notice of Additional Allegations and Continuation of Temporary Measures.  This time, SafeSport alleged that "multiple witnesses observed and/or experienced verbal harassment similar to allegation [sic] made by Claimant A," the drunken equestrian who confronted Plaintiff in February 2021. SafeSport continued its "no contact directive," but only as to Claimant A and Claimant B. Witness 2, an equestrian show operator and direct competitor of Plaintiff, is one of the "multiple witnesses" alleging verbal harassment. Much like Witness 1, who was coerced by Kurt Fabrizio, the SafeSport investigator, to provide a false statement against Plaintiff, Witness 2 has now come forward stating that she intends to contact the investigator, Kurt Fabrizio, "to recant."

46.   On December 2, 2022, Plaintiff requested details about the alleged "verbal harassment" allegedly involving nine witnesses.  By response dated December 12, 2022, SafeSport declined to provide additional details.  Unwilling to explain the supposed claims involving Plaintiff or identify the witnesses who allegedly experienced such "verbal harassment," SafeSport has prejudiced Plaintiff by not allowing him an opportunity to refute the ill-founded allegations. Notwithstanding SafeSport's refusal to provide Plaintiff with any

details of the new allegations against him, he has agreed to SafeSport's request to interview him yet again. The interview is currently scheduled for January 23, 2022.

47.     Over the two years since Defendants undertook their malicious persecution of Plaintiff, he has suffered extreme emotional distress, and his mental health, business, and personal relationships have suffered greatly.  Plaintiff has suffered continuous severe emotional distress, including anguish, depression, anxiety, worry, sleeplessness, shock, public humiliation, anger, shame, pervasive stress, racing heart, appetite changes, and fear of losing his livelihood.

## V. CLAIMS FOR RELIEF

### COUNT I—DECLARATORY JUDGMENT

48.     Plaintiff re-alleges and incorporates all preceding paragraphs.

49.     Defendant SafeSport has a legal obligation to investigate and impose disciplinary action in a manner that provides procedural due process to the accused. 36 U.S.C. § 220541(a)(1)(H).

50.     The SafeSport Code also provides Plaintiff, as a Respondent, with procedural due process protections, which have not been afforded him during the years of unfounded persecution of groundless claims against him.  SafeSport Code § XI.J.  For example, the SafeSport Code requires that Defendant SafeSport provide Plaintiff, as a respondent, with an opportunity to be heard during the investigation and the ability to challenge through arbitration any temporary measures or sanctions imposed by SafeSport. *Id.*

51.     Defendant SafeSport has breached its obligation to provide procedural due process to Plaintiff by refusing to dismiss unfounded allegations against Plaintiff that have remained pending for almost two years and by continuing to persecute him on contrived and unfounded claims.

52.     Defendant SafeSport's failure to act in accordance with statutes and its administrative code has occurred as a result of Defendants' actual malice towards and intent to harm Plaintiff, to violate his rights, and to place his health, well-being, and safety at risk.

53.     In accordance with section 1060 of the California Code of Civil Procedure, Plaintiff requests that the Court enter a declaratory judgment requiring that Defendant SafeSport provide the requisite procedural due process owed to Plaintiff by statute and also terminate its allegations, its malicious persecution, and its investigations against Plaintiff.

## COUNT II—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54.     Plaintiff re-alleges and incorporates all preceding paragraphs.

55.     Defendant's targeting and malicious persecution of Plaintiff constitutes extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

56.     Plaintiff has suffered, and continues to suffer, severe or extreme emotional distress as the actual and proximate result of Defendant's malicious deprivation of due process and other egregious misconduct. Plaintiff has suffered continuous, severe emotional distress, including anguish, depression, anxiety, worry, sleeplessness, shock, public humiliation, anger, shame, pervasive stress, racing heart, appetite changes, and fear of losing his livelihood.

57.     Defendant's conduct, as demonstrated by the whistleblower emails and their unwillingness to dismiss the unfounded and refuted allegations against Plaintiff, constitutes malice, as that term is defined by statute. CAL. CIV. CODE § 3294(c)(1). Having acted with actual malice, Defendant is liable to Plaintiff under 36 U.S.C. § 220541(d)(2). Specifically, Defendant's conduct was intended to injure Plaintiff and/or constitutes despicable conduct, which was carried on by Defendant with a willful and conscious disregard for Plaintiff's rights and his personal safety. CAL. CIV. CODE § 3294(c)(1). Plaintiff hereby seeks the recovery of exemplary damages from Defendant for the sake of example and by way of punishing Defendant for its egregious conduct targeting and persecuting Plaintiff without cause. CAL. CIV. CODE § 3294(a).

## VI. DEMAND FOR JURY TRIAL

58.     Plaintiff hereby demands a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order:

A.     Finding that Defendant's conduct was unlawful and was conducted with actual malice as to the rights and safety of Plaintiff, as alleged herein;

B.     Awarding such declaratory, injunctive, and other equitable relief as the Court deems just and proper;

C.     Awarding Plaintiff actual, compensatory, and exemplary damages;

D.     Awarding Plaintiff pre-judgment and post-judgment interest to the fullest extent allowed by law;

E.     Awarding Plaintiff reasonable attorneys' fees, costs, and expenses; and

F.     Granting such other relief as the Court deems just and proper.


Dated: January 23, 2023                    Respectfully submitted,

                                           By: */s/ Michael A. Caddell*
                                           Michael A. Caddell (SBN 249469)
                                           mac@caddellchapman.com
                                           Cynthia B. Chapman (SBN 164471)
                                           cbc@caddellchapman.com
                                           Amy E. Tabor (SBN 297660)
                                           aet@caddellchapman.com
                                           CADDELL & CHAPMAN
                                           628 East 9th Street
                                           Houston TX 77007-1722
                                           Tel.: (713) 751-0400
                                           Fax: (713) 751-0906


                                           **COUNSEL FOR PLAINTIFF
                                           ALI NILFORUSHAN**